# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-0508

**STATE IN THE INTEREST OF**
**H.M.D. AND J.J.W.**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
JENNINGS CITY COURT, WARD TWO
PARISH OF JEFFERSON DAVIS, NO. J48-06-1 AND J-48-06-2
HONORABLE STEVE GUNNELL, CITY COURT JUDGE AD HOC[*]

\*\*\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, and James T. Genovese, Judges.

**AFFIRMED.**

**Nick Pizzolatto, Jr.**
**Louisiana Department of Social Services**
**Office of Community Services**
**4250 5th Avenue**
**Lake Charles, LA 70607**
**(337) 475-3037**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
　　**Louisiana Department of Social Services**

---

[*]By order of February 11, 2009, Judge Steve Gunnell was assigned as judge ad hoc by the supreme court to hear and dispose of this case after Judge Daniel Stretcher recused himself from this matter.

**Robert J. Lounsberry, Sr.**
**Attorney at Law**
**P. O. Box 1351**
**Jennings, LA 70546**
**(337) 616-3888**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **J.D.**

PETERS, J.

This matter is before us on remand from the supreme court. When we previously reviewed it, J.D.[1] had appealed a judgment terminating her parental rights to her two minor children, J.J.W. (born January 24, 2005) and H.M.D. (born November 30, 2005).[2] We reversed the judgment and remanded the matter to the trial court for further proceedings. *State in the Interest of H.M.D. and J.J.W.*, 09-508 (La.App. 3 Cir. 10/7/09), 20 So.3d 564. Relying on the five-day service requirement of La.Ch.Code art. 1021, we found the trial court erred in denying J.D.'s motion for continuance when domiciliary service of notice of the hearing occurred only two days prior to the adjudication hearing.

The supreme court granted a supervisory writ filed by the State of Louisiana through the Department of Social Services, Office of Community Services (referred to hereafter as "the state" or "OCS"), set aside our reversal and remand, and remanded the matter to this court for consideration of the remaining assignments of error. *State in the Interest of H.M.D. and J.J.W.*, 09-2373 (La. 1/8/10), 26 So.3d 129. The supreme court found that La.Ch.Code art. 1021 applies only to the initial answer hearing in a juvenile proceeding, and that the trial court did not abuse its discretion in denying the continuance. Pursuant to the supreme court's instruction, we now address the remaining assignments of error: (1) that the trial court erred in concluding that J.D. had not substantially complied with the requirements of her case management plan, and (2) that the trial court erred in concluding that there was no reasonable expectation of future significant improvement.

---

[1]The initials of the children and their parents are used to protect the identity of the minor children. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

[2]The children's mother and father were never married. The father, M.W., was also named as a defendant in the termination proceedings, but consented to his parental rights being terminated and has not appealed that determination. Thus, we address only the termination of J.D.'s parental rights.

## DISCUSSION OF THE RECORD

The record establishes that OCS first became involved with J.D. and her children on April 12, 2006,[3] and that trial on the termination issue occurred on February 12, 2009. At trial, the state introduced two exhibits[4] and called four witnesses to testify. Although her attorney participated in the termination hearing, J.D. did not attend the hearing.[5] Her attorney did, however, introduce three exhibits.[6] Upon completion of the evidence, the trial court rendered judgment terminating J.D.'s parental rights.

Despite OCS's mid-April 2006 involvement, the judicial system did not become involved until July 20, 2006, when OCS sought and received an instanter oral order from the trial court authorizing OCS to take the two children into custody. The affidavit filed in support of the July 20 order was signed by Kristi Gott, identified only as "an employee" of OCS's Jefferson Davis Parish office. In her affidavit, Ms. Gott asserted that on July 20, the OCS office had received "a report of dependency and lack of adequate shelter" concerning the two children. The trial court set a continued custody hearing for July 25, 2006.

---

[3]OCS's first involvement was to investigate an April 5, 2006 report that J.D. was giving H.M.D. homogenized milk and that H.M.D. had not been to the doctor or received any immunizations.

[4]The two exhibits were the entire record of these proceedings as well as the H.M.D.'s medical records, which indicated the child's treatment for allergies and asthma.

[5]Her attorney's explanation for J.D.'s failure to appear was that she did not have personal notice of the hearing despite the domiciliary service two days before the hearing.

[6]The attorney introduced a letter from the City of St. Martinville, Louisiana, indicating that J.D. had maintained an apartment in that city since January of 2007; a certificate reflecting that J.D. had completed an anger management class with Extra Mile Region IV, Inc., on September 25, 2007; and a certificate reflecting that she had completed a healthy parenting program with CDJ Rehabilitation Services, L.L.C., on May 6, 2008.

2

J.D. appeared at the July 25, 2006 hearing, accompanied by her court-appointed counsel. Without admitting to any specific allegation, she admitted that her children were in need of care and consented to OCS's continued custody. Based on this assertion, the trial court confirmed its July 20 oral order and continued custody of the children in the state pending further orders of the court.

The next step in the process occurred on August 18, 2006, when J.D. and representatives of OCS met and entered into a case management plan. The plan restated the original reasons for removal and stated that J.D. desired to be reunited with her children and that OCS was seeking relative placement while "working with [J.D.] in order for her [sic] be able to regain custody of her children." In another section of the case management plan, OCS identified as its goal "Reunification."

On September 7, 2006, the state filed a petition to have the children adjudicated in need of care. The trial court set the matter for hearing on September 14, 2006. On that date, J.D. appeared with her attorney and entered an admission that her children were in need of care, again without admitting to any specific allegations. Based on this admission, the trial court adjudicated the children in need of care pursuant to La.Ch.Code art. 606 and approved the August 18 case management plan.

The next meeting to review the case management plan occurred on January 4, 2007. However, the record before us does not contain a copy of the case management plan generated from this meeting. Instead, it contains a written summary of OCS's position with regard to future actions. The summary is dated January 17, 2007, and was not prepared by OCS officials, but by the state's attorney. That report suggests that J.D. "was jumping from shelter to shelter" after the initial order and had resided, not in Jefferson Davis Parish, but in Lafayette Parish, under the supervision of the

3

Lafayette Office of OCS, between July 2006 and October 2006.[7]  According to the report, in October 2006, J.D. contacted Jessica Frey, her OCS worker in Jefferson Davis Parish, to inform the worker that she was living back in the parish.  Based on these assertions, OCS recommended that the children remain in its custody and supervision.

The trial court held a review hearing on January 18, 2007.  The minutes of that hearing reflect that J.D. and her attorney were present and voiced no objections to the recommendations of the January 17 report or the request for continued custody.  The trial court then ordered that OCS maintain custody of the children, advised J.D. of her obligation to complete all the requirements of the case management plan, and approved the case plan dated January 17, 2007.  The trial court also ordered that the next review hearing be held July 19, 2007.

On July 6, 2007, OCS and J.D. met for another administrative review of the case management plan.  With regard to J.D.'s progress, the report generated from this meeting states that:

> *[J.D.] has successfully secured a home for herself with utilities connected and has furnished it.  She has kept the agency informed about any changes in her contact information.  [J.D.] completed a psychological evaluation on January 25, 2007 as requested.  She also participated in a Parenting Wiseley program consisting of three class periods.  [J.D.] has attended most of the visits with her children but she has missed some also.*
> [J.D.] does not bring the children gifts for holidays or birthdays. [J.D.] does not provide adequate supervision to her children during visitation at all times.

The report further provides that J.D. still wanted her children returned to her, that no relatives had been located for placement, and that "[t]he children were moved into an

---

[7]This assertion is in conflict with the fact that J.D. appeared at the August 18 meeting and appeared in open court on September 14, 2006.

4

adoptive placement on 5/3/07 due to [J.D.'s] lack of progress *in the allotted time*."

(Emphasis added.) In its overall assessment, which appears to conflict with the afore-

stated progress summary, the report provides:

> The agency has been attempting to work with [J.D.] for the last 11 months. She has not made significant progress in the allotted time. The agency has placed the children with an adoptive resource. The children are now establishing a strong and healthy bond with their foster parents. The children are thriving.
>
> *The agency continues to work with [J.D.] on the completion of her case plan. The agency enrolled [J.D.] in a Parenting Wisely program and a Life Skills program; however, [J.D.] refused to attend the Life Skills program. The agency monitors [J.D.'s] progress in securing a safe home for her children removing the risks that prompted the children's removal.*

The trial court held a review hearing on July 19, 2007, as scheduled. J.D. did

not attend this hearing although her counsel was present. This hearing generated an

order maintaining custody with OCS, approving the July 6 case management plan,

and finding that inadequate progress had been made toward reunification. However,

the judgment further rejected the move toward adoption and specifically ordered that

the plan for permanent placement of the children remain reunification with their

mother.

Less than one week later, OCS held its own staff meeting, wherein it appears

to have made the decision to ignore the judgment of the trial court. The result of that

staffing meeting held July 23, 2007, was OCS's unilateral decision to pursue

termination of J.D.'s parental rights.[8] Through an August 21, 2007 letter, OCS finally

---

[8]The record contains no evidence that J.D. participated, or was even invited to participate, in this meeting.

notified the trial court of this decision. OCS attached to the letter a report dated the same day, wherein it stated its reasons to be as follows.[9]

> The agency feels that [J.D.] has not made significant progress toward her case plan. For many months she did not stay in contact with her worker and failed to visit her children. [J.D.] does not know her children's dates of birth. Half of the time [J.D.] does not know what month it is. During visitation with her children she does not provide adequate supervision to her children at all times. [J.D.] has a hard time handling the children for the entire two-hour visit. The children scream and cry for most of the visits. The agency feels that it would not be in the best interests of the children to continue to work toward return. *The agency is changing the goal to adoption.*

(Emphasis added.)

On September 6, 2007, the matter was again before the trial court for consideration of the state's change of position. Noting that J.D. had not been served with notice of the hearing,[10] the trial court continued the matter until October 4, 2007. J.D. appeared on October 4, as did her attorney. Without comment from any party, the trial court ordered the August 12 report filed into the record and provided the parties with a new case management plan establishing termination of parental rights as the new objective.

It took four additional months for the state to file its petition to terminate J.D.'s parental rights. This occurred on January 7, 2008. However, despite this delay, the proceedings moved forward in the fall of 2007 as if the termination proceeding had already been filed.[11] When filed, the petition to terminate J.D.'s parental rights based OCS's request for relief on the following assertions:

---

[9]It is obvious that these reasons were present when OCS made its recommendations to the trial court at the July 19, 2007 hearing. Furthermore, OCS did not reference the trial court's judgment of July 19 ordering OCS to continue pursuing reunification.

[10]All counsel were present, as was Jessica Frey with OCS.

[11]The record contains a notice filed October 23, 2007, that the trial date for the termination proceedings had been continued from January 17, 2008, to January 24, 2008.

1. There has been no significant or timely parental compliance with the case plans for services approved by the court as necessary for the safe return of the children;

2. The children have been in the State's custody for over one year. They need a stable and permanent home and cannot wait any longer for their mother to rehabilitate;

3. She disappeared from August 24, 2006 until December 6, 2006 and then again disappeared from December 20, 2006 until January 17, 2007;

4. She has failed to timely attend court ordered parenting classes. She chose instead to attend a parenting class not authorized by the AGENCY. She just recently registered for an approved parenting class, however, the class is a several month course and she registered over a year after her children came into custody.

5. She was ordered to attend a psychological evaluation and to submit to any treatment or attend any courses that the evaluator felt was necessary to facilitate the goal of reunification.

   On January 25, 2007 she presented for a psychological evaluation with Dr. Ed Bergeron, Ph D, MP. He recommended mental health services, intense individual therapy, anger management and parenting skills training, and also recommended that reunification could not be attempted until the mother complied with all of the recommendations and showed a pattern of stability and improvement. He suggested drug therapy as well.

   The mother failed to submit herself for **any** of the recommended treatment until just recently. After continually refusing to submit to the life skills program, she is now attempting to comply.

6. The mother recently tested positive for Marijuana, so the agency is now faced with this new problem presented by the mother's actions.

   Additionally, the mother recently became very belligerent with a State employee supplying transportation to her.

7. The mother has not supported her children since they came into custody. Therefore, she has abandoned her children pursuant to Ch. C. Art. 1015(4).

8. The mother has made about ½ of the visits offered to her. That is not significant contact as contemplated by Ch. C. Art. 1015(4) and therefore she has abandoned her children.

The matter obviously did not go to trial on January 24, 2008. Instead, that hearing was used as an answer hearing for the January 7 filing. J.D. appeared at the hearing and denied all of the allegations. The trial court then set trial of the termination issue for March 13, 2008. Additionally, because OCS and J.D. had participated in another case management plan meeting on January 8, 2008, the trial court adopted the recommendation of OCS arising from that meeting that custody remain in the state pending the outcome of the termination proceedings. The state had provided J.D. and the trial court with a summary of the meeting through correspondence dated January 8, 2008. In that report, OCS stated its position with regard to J.D. as follows:

> The agency feels that [J.D.] continues to pose a high risk to her children. [J.D.] has not competed her case plan. However, [J. D] has completed anger management classes and is currently enrolled and attending the Life Skills Program. The agency is awaiting a report regarding her participation and progress. The agency was able to complete two random drug screens on [J.D.] and both were positive for THC. When [J.D.] was questioned she denied drug usage and said that the results were wrong. The case plan will be amended to include completion of a substance abuse program. Since the last court hearing a situation arose where [J.D.] had become verbally abusive to an OCS staff member during transportation. [J.D.] continues to take no initiative for herself; she rarely knows her children's dates of birth or what day it is. [J.D.] rarely brings food or gifts for the children. [J.D.] recently contacted Senator Donald Cravins regarding her situation and that she was being treated unfairly. Senator Cravins's office contacted agency and an appointment was set up between all parties involved. [J.D.] failed to show up for the appointment.

The matter did not go to trial on March 13, 2008. By written motion filed March 11, 2008, J.D. sought and obtained a continuance of the trial date until May 8, 2008. On May 6, 2008, OCS sought and received a continuance of that trial date based on its assertion that it could not serve its subpoenas in time to assure witness attendance at the trial. The trial court refixed the trial for July 24, 2008. By a written motion filed July 24, 2008, J.D. received a continuance based on the fact that the

psychological report prepared by the state's expert had never been made available to her attorney. The trial court refixed the matter for October 9, 2008. The October 9, 2008 trial was also continued, this time on the motion of the state. The minutes of that day stated that the state sought the continuance and the other parties concurred in the grant, although it is unclear why the state sought the continuance. The minutes reflect that the effect of the continuance was the trial court's order that the case plan be amended as follows:

> Court ordered OCS provide assistance in obtaining therapy, psychiatric medical treatment, and medication for the mother in St. Martin Parish within 7 days; the OCS office will provide transportation for the initial signup, but the mother is responsible for all transportation after that time; the mother must show willingness to comply with the treatment recommendations; a preliminary report containing services provided and progress must be presented to counsel within 30 days; after such time a reassessment be conducted on the mother by Ed Bergeron. Court advised Jessica Frey with the Office of Community Services that the revised case plan needs to be completed with one week. Court further ordered the mother receive an evaluation within 7 days and the amended case plan be presented to her at the end of that time.

Trial on the termination of parental rights was rescheduled for December 3, 2008.

On October 30, 2008, the trial court upset the December 3, 2008 trial date and reset the matter for January 29, 2009. Nothing in the record explains the need for the refixing or which party requested the change. Additionally, the notice of refixing was forwarded only to the attorneys of record and Ms. Frey with OCS. This date lasted only a short time as well. On November 24, 2008, OCS requested a continuance of that date. The trial court granted the request and reset the matter for February 12, 2009. Serving instructions on this motion included service by mail on J.D.'s counsel and personal service on J.D. at a St. Martinville, Louisiana address. However, the notice in the record provides only for service on the attorneys of record and Ms. Frey.

9

The matter finally went to trial on February 12, 2009, and resulted in a judgment terminating J.D.'s parental rights. The four witnesses called by the state were Kimberly James, J.D.'s OCS case worker since December of 2007; Summer Oyster, the children's OCS caseworker since December 1, 2008; Jessica Frey, another OCS caseworker who had worked with J.D. and the children off and on from July of 2006 until July 2008; and M. W., the children's father. As previously stated, J.D. was not present at the trial, but was represented by her court-appointed counsel.

According to Ms. James, J.D. had completed the drug assessment requirements imposed on her by OCS and did not require any drug-related services; J.D. had maintained an apartment for over two years prior to trial; J.D. was disabled and living on a $446.00 monthly disability check; and since Ms. James took over the supervision of the case, someone from OCS had been responsible for transporting J.D. to the family-team conferences; and, at the time of the trial, J.D. was attending a 16-week nurturing parenting course with Extra Mile. In fact, Ms. James testified that J.D. had complied with all of her case management plan except the requirement for mental health services. She did acknowledge, however, that on one occasion J.D. refused to perform a random drug screen, and, on one other occasion in 2007, she tested positive for marijuana; that she had missed many visits with her children (although recently she had attended all of her visits); and that she was often not at home when Ms. James came to visit.

Ms. Oyster testified that she had been the children's OCS caseworker for only three months. During that time, Ms. Oyster attended all of J.D.'s visits with her children and observed some of J.D.'s parenting classes. According to Ms. Oyster, the children are doing very well in their foster placement, but they have some behavioral problems both before and after visiting with J.D.

10

Ms. Frey was J.D.'s initial OCS caseworker. In fact, she had actually worked with J.D. as a family services representative providing help to J.D. before the July 20, 2006 instanter order. However, after the children came into the state's custody, Ms. Frey's primary obligation was that of caseworker to the father, although she worked a total of six months as J.D.'s caseworker. Ms. Frey testified that one of the conditions of J.D.'s case plan was to complete a psychological evaluation, which she did by submitting to an evaluation by Dr. Ed Bergeron, a Lafayette, Louisiana medical psychologist. According to Ms. Frey, Dr. Bergeron recommended mental-health services that included intense individual therapy, anger management, and parenting skill training. Ms. Frey testified that while she had the cases J.D. never accepted the mental-health services offered to her and did not participate in intense individual therapy. However, Ms. Frey testified that in making this comment she was relying, not on personal knowledge, but on information in the record provided by J.D.'s case worker.

Dr. Bergeron's written report is in the record. According to this report, he first saw J.D. on January 25, 2007, when he found her to "be markedly unstable on a psychological level" and concluded that she was suffering from "depression and a severe personality disorder." Based on this evaluation, he concluded that at that time she was incapable of caring for her children and, therefore, should not be awarded their custody.

Pursuant to the October 9, 2008 trial court order, Dr. Bergeron evaluated J.D. a second time on December 3, 2008. The purpose of that evaluation was to determine what improvement, if any, she had made since his last evaluation. He concluded, after that evaluation, that she was still "extremely psychologically unstable." In fact, he observed that, by her approach to taking the tests administered, she intentionally

invalided the tests results of personality and parenting style "out of sheer defiance." He concluded that "she was engaging in passive-aggressive behavior," a behavior "typical of an individual who suffers from Borderline Personality Disorder." He again recommended that the children not be returned to her, as "there has been no improvement since her last evaluation." Dr. Bergeron did not testify at the termination hearing.

In its reasons for judgment, the trial court found that more than one year had elapsed since the children had been removed from J.D.'s custody; that J.D. had failed to comply with the terms of the case management plan imposed upon her; and that, despite early intervention, there is no reasonable expectation of significant improvement in the near future. In reaching this conclusion, the trial court placed much emphasis on J.D.'s underlying mental condition as diagnosed by Dr. Bergeron.

The assignments of error that this court did not previously address are J.D.'s assertions that the trial court erred in concluding that she had not substantially complied with the requirements of her case management plan and that the trial court erred in concluding that there was no reasonable expectation of future significant improvement.

**OPINION**

In *State in the Interest of J.A.*, 99-2905, pp. 7-8 (La. 1/12/00), 752 So.2d 806, 810-11, the supreme court stated:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d

12

707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.*, 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of S.M..*, 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir.1982).

In balancing the interests of the parent versus the child, the state's burden in a termination proceeding is first to establish by clear and convincing evidence one of the statutory grounds for involuntary termination of a parent's rights and then to establish by clear and convincing evidence that termination of parental rights is in the child's best interest. *Id.* The trier of fact does not reach the best interest issue unless and until the state establishes a ground for termination. *State in the Interest of M.R. v. S.F.H.*, 09-889, (La.App. 3 Cir. 12/9/09), 25 So.3d 1021, *writ denied*, 09-2812 (La. 1/14/10), 24 So.3d 878. Additionally, we review the trial court's findings of fact under a manifest error/clearly wrong standard. *Id.*

The eight reasons listed in the state's petition for termination of J.D.'s parental rights can all be categorized into one ground under La.Ch.Code art. 1015:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

La.Ch.Code art. 1015(5).

While the allegations of the state's petition are very specific, the evidence presented failed to address some of the eight assertions and conflicted with others.

Still, the state did establish by uncontradicted evidence that J.D. failed to comply with various aspects of the case management plan in that she did not meet the requirement for mental health services; on one occasion she tested positive for marijuana, and on one occasion she refused a random drug test; she missed many scheduled visits with the children; she failed to complete a psychological evaluation until very late in the sequence of events; and she intentionally invalidated the tests performed by Dr. Bergeron. Given the evidence presented, we cannot say that the trial court committed manifest error in concluding that the state proved by clear and convincing evidence that J.D. failed to substantially comply with the overall case plan for services as originally filed, amended, and approved by the trial court.

Proof of the second prong of the inquiry under La.Ch.Code art. 1015(5)—whether the state established by clear and convincing evidence that there is no reasonable expectation of significant improvement in J.D.'s condition or conduct in the near future, considering the children's age and their need for a safe, stable, and permanent home—is less clear based on the direct evidence presented.

Sadly, the state's direct evidence failed to address this point at all. The three witnesses who testified concerning the relationship between OCS and J.D. restricted their testimony to past history, and Dr. Bergeron's reports failed to directly address this issue.

In his report, Dr. Bergeron did conclude that when he interviewed J.D. on January 25, 2007, " *she was not ready to be reunified* with her children because she was deemed to be markedly unstable on a psychological level." (Emphasis added.) It was in the follow-up interview of December 3, 2008, that Dr. Bergeron concluded that J.D. intentionally tried to invalidate the test results. The summary of his findings is as follows:

14

Based on information derived from the current evaluation, this psychologist cannot recommend reunification as there has been no improvement since her last evaluation. Based on her presentation and on the manner in which she responded to formal psychological assessment, treatment motivation is deemed poor.

While it would have been extremely helpful to this court for the state to have asked the direct question concerning reasonable expectation of significant future progress, we do not find that this failure alone warrants reversal.[12] In the matter before us, considering the entire history of J.D.'s actions and inactions from the time her children were removed until trial; the fact that J.J.W. is five years old and H.M.D. is almost five, and that both are now school age; that the children have lived in a stable environment for almost four years; and Dr. Bergeron's testing results and conclusion concerning J.D.'s treatment motivation, the trial court's conclusion with regard to the "reasonable expectation" issue is not manifestly erroneous.

Having concluded that the trial court was not clearly wrong in determining that a ground for termination exists, we turn to the "best interest" issue. As the supreme court noted in *State in the Interest of J.A.*, 752 So.2d at 811:

> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all

---

[12]While we do not conclude that the state's failure to directly address this issue in this case is fatal to its request for termination of J.D.'s parental rights, we do not wish to suggest that this issue is not of critical importance in all termination cases. Our holding is limited to the fact situation before us. We also find disturbing OCS's unilateral decision to ignore the trial court's order of July 19, 2007, to place the move toward adoption on hold and continue the reunification goal. Still, this is a matter for the trial court to address and does not address the final outcome of this litigation.

legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State in the Interest of A.E.*, 448 So.2d [183] at 185 [La.App. 4 Cir. 1984].

Balancing J.D.'s rights against those of her children and considering the fundamental purpose, focus, and primary concern of termination proceedings as explained by the supreme court, we conclude that the trial court did not commit manifest error in concluding that the best interests of the children require termination of their mother's parental rights.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects. We assess all costs of these proceedings to J.D.

**AFFIRMED.**

16